**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Bendtrand Global Services S.A., Runner | ) | |
| Runner LLC and Alexander Kaplin | ) | |
| | ) | |
| Plaintiffs | ) | Case No. 21-CV-4684 |
| v. | ) | |
| | ) | |
| Daniel Silvers | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant | ) | |

## COMPLAINT

Plaintiffs, Bendrand Global Services S.A., Runner Runner LLC and Alexander Kaplin, by and through their attorney at Elan Law Group, for their Complaint against the Defendant, Daniel Silvers, state as follows:

### PARTIES

1.      Plaintiff, Alexander Kaplin ("Kaplin"), is a natural person and a resident of Florida.

2.      Plaintiff, Runner Runner LLC ("Runner") is a Wyoming limited liability company. Kaplin is the sole member of Runner.

3.      Plaintiff, Bentrand Global Services S.A. ("Bentrand") is a Panamanian corporation. Kaplin is the sole shareholder of Bentrand.

4.      Defendant, Daniel Silvers ("Silvers") is a natural person and a resident of Chicago, Illinois.

### JURISDICTION AND VENUE

5.       This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(3), because the case is between citizens of different states in which a subject of a foreign state is an additional party.

1

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), because the only Defendant in this action resides in Chicago, Illinois.

## FACTS COMMON TO ALL COUNTS

### Kaplin and Silvers: Relationship and Background Facts

7.      Kaplin has been working as a trader, specializing in domestic exchange-traded funds ("ETF") for about thirteen years.

8.      Prior to working as a trader, Kaplin worked on the American Stock Exchange as a specialist, making markets in domestic ETFs.

9.      Kaplin and Silvers met through a mutual acquaintance in or about 2010.

10.      At that time, Kaplin and another individual (collectively the "Traders") worked together trading domestic ETFs.

11.      When Kaplin and Silvers met, Silvers represented that he was a software specialist with extensive experience in building software programs used in trading and analysis of financial products.

12.      Among other things, Silvers said he had worked as a software specialist for the New York Stock Exchange and the Intercontinental Exchange.

13.      Following a few discussions with Silvers, the Traders retained Silvers to build certain software for them.

14.      When trading ETFs, the Traders used data provided by the National Securities Clearing Corporation (the "NSCC") to price EFTs.

15.      The software – referred to as the "parser" – would automatically parse raw data provided in the NSCC files allowing the Traders to price ETFs in an excel spreadsheet.

16.      Silvers built the parser to the Traders' satisfaction.

2

17.     While Silvers was working on the parser, he and Kaplin became friends and began to socialize on a regular basis.

18.     In or about 2016, when Silvers moved to Chicago, the parties continued to maintain their relationship, and Silvers and his wife travelled to visit and stay with Kaplin in his house in Roxbury, Connecticut.

19.     In or about 2017, the Traders retained Silvers to build software that would allow them to price ETFs in real time.

20.      Silvers agreed to build the software, referred to as the fair pricer (the "FP"), for twenty thousand dollars.

21.     The Traders paid Silvers up front, and Silvers spent a couple of weeks at Kaplin's Connecticut house working on the project.

22.     After the work was completed, the FP did not function properly, crashing and freezing on a regular basis.

23.     Silvers explained that the problem was caused by Bloomberg's application programming interface and that it would cost an additional ten thousand dollars to fix the FP.

24.     The Traders paid Silvers the additional amount, but Silvers kept delaying the work, citing various obstacles.

**Kaplin and Silvers Decide to Build a Decentralized Cryptocurrency Exchange**

25.     In 2017, cryptocurrency exchanges were becoming mainstream, but in Kaplin's opinion, they were poorly designed.

26.     The exchanges were difficult to use, and trading on them required many unnecessary steps, each prone to error.

27.     It was as though the exchanges were designed by software programmers who were unfamiliar with trading.

28.     Kaplin wondered whether it was possible to build an exchange that was fast and had a simple and use-friendly trading interface.

29.     In or about December of 2017, Kaplin shared his thoughts with Silvers, and Silvers expressed a lot of interest in the idea.

30.     Silvers said it was possible to build such an exchange, and it was not particularly complicated, given Silvers' knowledge and experience.

31.     If Kaplin was willing to finance the project, Silvers said he would be able to build a functional model of an exchange within six months.

32.     Following a few discussions, in or about the beginning of 2018, Kaplin and Silvers decided to work together to build a decentralized crypto-currency exchange (the "DEX").

33.     Generally, a cryptocurrency exchange is a platform that facilitates trading of digital assets.

34.     Such a platform can be centralized or decentralized.

35.     A centralized exchange involves an intermediary that acts as both a middleman and a custodian of the digital assets.

36.     By contrast, decentralized platforms are non-custodial and allow for direct transactions between the interested parties, without any intermediary or central authority.

37.     Since there is no intermediary, decentralized exchanges are built on a blockchain, and they employ smart contracts that self-execute under set conditions.[1]

**Kaplin and Silvers Reach an Agreement**

38.     Between February and March of 2018, Kaplin made a few trips to Chicago to discuss and negotiate the terms of the project.

39.     During these discussions, the parties agreed that Silvers would build the code for a basic version of a DEX.

40.     The parties agreed that the work would be completed by August of 2018.

41.     Silvers specifically stated to Kaplin: "if you give me until August [2018] and guarantee that you will cover all the expenses until then, I will give you a functional model of the DEX."

42.     It was agreed that Silvers would hire a few developers outside of the U.S. to assist Silvers with building the code, and Kaplin would pay their compensation.

43.     It was further agreed that Kaplin would purchase all the necessary computer equipment, pay for the rental of an office space and cover other similar expenses.

44.     In addition, Kaplin would advance to Silvers $9,000 per month in the form of an interest-free loan.

45.     The parties further agreed that once a functional version of the platform was built, the ownership rights to the technology would be transferred to a new company ("Newco"), and Kaplin and Silvers would become equal shareholders of the company.

46.     After that, Newco would raise additional funds that would be used to finish the project.

47.     The parties estimated that Kaplin's total investment would not exceed $250,000.

---

[1] Blockchain is a structure that stores transactional records, in several databases, in a network connected through peer-to-peer computers. Smart contracts are programs stored on a blockchain that run when predetermined conditions are met. Smart contracts automate the execution of agreements.

48.     The parties agreed that Silvers' work on the FP would also be completed by August, 2018.

**Silvers Engages in a Continuous Course of Deceit and Misrepresentations**

49.      Once the basic terms were agreed upon, Silvers commenced his work on building the DEX.

50.     He identified and retained software developers.

51.     He asked Kaplin to purchase various computer equipment and rent offices in two locations, including Chicago, and eventually, Panama City.

52.     Initially, Kaplin retained legal counsel to draft and review contracts with the independent contractors and vendors.

53.     Silvers, however, said he could handle all such matters himself, because in his prior employment, he worked closely with attorneys and legal departments.

54.     All the expenses were paid by Kaplin personally, and/or by Bentrand and Runner (collectively, the "Companies").

55.     In or about July of 2018, Silvers said he could not complete the project within the agreed upon time, because he had encountered various difficulties and unanticipated hurdles.

56.     Among other things, Silvers blamed software developers, who were allegedly "not as good as [he] thought they would be."

57.     According to Silvers, he worked "day and night" on building the code and needed just a little more time to complete the project.

58.     He promised that things would go faster once he was able to assemble a better team.

59.     In or about December of 2018, Kaplin got suspicious about Silvers' ability to perform.

60.     At the time, Kaplin and Silvers were in Eastern Europe, meeting with a group of individuals who were engaged in various crypto projects.

61.     During one of the meetings, Silvers was asked questions about the DEX code, which he appeared to be unable to answer.

62.     After the meeting, Kaplin confronted Silvers, explaining his concerns.

63.     Silvers assured Kaplin that the only reason Silvers did not answer some questions at the meeting was that he did not want to reveal certain confidential information about the DEX code.

64.     Relying on Silvers' representations, Kaplin continued to finance the project.

65.     In anticipation that a functional version of the DEX would be built soon, Kaplin continued to maintain offices, pay compensation to the employees, and pay various other service providers.

66.      In addition, capitalizing on his personal relationship, Kaplin spent time and resources trying to recruit blockchain and crypto influencers to conduct public relations work for the project.

67.     Furthermore, Kaplin bore the cost of various crypto conferences and summits in Europe, South Korea, and Singapore, which Silvers said were necessary to attend.

68.     As it later turned out, some of Silvers' "business" travels were for his personal benefit, including a trip to South Korea, where Silvers travelled to meet with a woman, who had previously lived in Chicago, and whom he had been dating.

69.     While Silvers continued to reside and work out of the office in Chicago, he travelled to Panama City frequently at Kaplin's expense.

70.     In or about March of 2020, Silvers stated that it was necessary for him to spend more time in Panama and requested that Kaplin rent an apartment for him in Panama City.

71.     Starting at the end of 2018, Kaplin regularly raised concerns about continuous delays, missed deadlines, and having to spend more money than he had planned or anticipated.

72.     Silvers always had excuses for the delays and the alleged setbacks, and always said the DEX was almost completed.

73.     He continuously assured Kaplin that the DEX would be truly unique and innovative.

74.     Nonetheless, as a result of Kaplin's frequent complaints about continuous delays, Silvers agreed to reduce his shares in Newco to 25%, and eventually to 12.5%.

75.     As the delays continued into 2019 and 2020, Kaplin requested that the project be placed on hold to allow parties to regroup and seek outside investment.

76.     Silvers always resisted this idea, citing various technical reasons as to why putting the project on hold was not beneficial or even possible.

77.     By the end of 2020, Kaplin expressed to Silvers that unless a functional version of the DEX was completed within the next few months, he would not be able to continue to provide financing.

78.     Silvers assured Kaplin that the project would be completed by no later than April 15, 2021, and that it was a firm deadline.

79.     On or about March 1, 2021, Kaplin engaged legal counsel to form Newco in the U.S. and to conduct a legal review ensuring that the first version of the DEX would be in compliance with all applicable U.S. laws.

80.     Silvers once again resisted legal counsel's involvement.

81.     He told Kaplin, as he had done before, that he had an extensive knowledge and familiarity with all the potentially applicable legal issues, because as part of his prior employment, he "worked closely with legal and compliance."

8

82. He told Kaplin that the attorney's involvement was unnecessary and a waste of his time.

83. In communication with legal counsel, Silvers was evasive and reluctant to provide basic information about the code.

84. When he was asked to prepare a spreadsheet describing the technology and was given specific directions as to what data the spreadsheet must contain, Silvers provided irrelevant and incomplete information.

85. Gradually, it became apparent that Silvers had failed to do what he had promised.

86. First, it became apparent that – contrary to Silvers' numerous representations that he was coding "day and night" – Silvers did not do much coding.

87. Software developers, who worked for the Companies under Silvers, reported that, all in all, Silvers built less than half percent of the code.

88. Silvers' participation consisted of instructing the developers as to what features they were expected to build.

89. His instructions were erratic, inconsistent, and often caused the developers to raise their eyebrows.

90. Further, it became apparent that Silvers' continuous representations that a functional DEX was almost completed turned out to be a blatant lie.

91. In actuality, from the beginning of 2018 until March of 2021, the developers were mostly working on building a blockchain.

92. Based on the developers' reports, in the beginning of 2021 the blockchain was still incomplete and was "not connecting properly."

93. Based on the developers' reports, they "did not even touch smart contracts" – the very foundation of any DEX – until the beginning of 2021.

94.     One developer did work on a front-end feature of the DEX, primarily consisting of a crypto wallet, but the wallet was never completed.[2]

95.     Based on the developers' reports, substantial resources were dedicated to building various blockchain functionalities that were completely unrelated to the DEX, but none of the features were ever completed.

96.     In addition, none of the features were approved or authorized by Kaplin.

97.     Further investigation revealed that the code was not properly documented.

98.     Moreover, pursuant to Silvers' instructions, the developers incorporated hundreds of open-source software into the code without any review or understanding of the applicable licensing restrictions.

99.     With respect to the FP, which was finished in the summer of 2020, contrary to his representations, Silvers did not do any work on the FP himself.

100.    Even though Silvers received full compensation for the FP back in 2017, he never completed the work.

101.    Instead, unbeknownst to Kaplin, Silvers directed one of the developers to work on the FP.

102.    Pursuant to Silvers' direction, the developer equipped the FP with unnecessary features which were never requested or authorized by the Traders.

103.    Kaplin continues to pay the developer, who is currently working on removing these features.

## **Silvers Engages in Further Illegal Conduct**

104.    In or about March of 2021, as it was becoming apparent that Silvers had failed to perform as promised, Silvers' behavior became erratic.

---

[2] Crypto wallet is a software program that stores the passwords that allow access to cryptocurrencies.

105.    Among other things, Silver denied that he agreed to 12.5% in Newco, stating that it was Kaplin who should get 12.5% because the code was Silvers' "baby."

106.    He proclaimed that he could have been making $400,000 per year, but instead was working for "nothing" and demanded that Kaplin pay him salary and benefits.

107.    At one time, he told Kaplin that it did not matter that the DEX was never built, because the technology that he built was far superior.

108.    Kaplin, however, could not possibly understand it, because he did not know "anything about technology."

109.    When Kaplin responded, noting that he spent about $1.4 million paying for something he did not agree to, Silvers stated that this also did not matter, because $1.4 million was "nothing" to Kaplin who could "make a million in a day."

110.    When Kaplin scheduled a meeting with potential purchasers of the technology in an attempt to recover some of his losses, Silvers failed to show up, falsely claiming that he was ill and had to go to the hospital.

111.    On or about May 1, 2021, after yet another conflicted conversation with Kaplin, Silvers stated that Kaplin was "no longer needed," and that he had only been "hurting the project" with his insistence on deadline and deliverables.

112.    Silvers declared that because Kaplin did not know "anything about technology," Silvers would not give him the code.

113.    As proof that Kaplin knew nothing about technology, Silvers stated that he always had access to Kaplin's personal computer, without Kaplin's knowledge.

114.    A few minutes later, Silvers unilaterally and without notice, cut off Kaplin and software developers' access to their email accounts.

115.    In addition, Silvers cut off the software developers' access to Jira knowledge management software and a database containing the code.

116.    Furthermore, Silvers cut off Kaplin's access to other Companies' business records and accounts.

117.    In addition, on the same day, acting through an agent in Panama City, Silvers confiscated a computer from one of the software developers working from Panama City.

118.    On or about May 1, 2021, Kaplin, via an email and certified letter, demanded that Silvers restore Kaplin's access to the code, emails and other accounts.

119.    Kaplin also demanded that Silvers return all of the Companies' property and assets that were in Silvers' possession, including, documentation related to the source code; all backup documentation and technical specs; email communications and video recordings; passwords and admin rights to hosting, domain names, Jira knowledge management software, and other cloud-based and physical systems.

120.    Kaplin also demanded that Silvers return and surrender all physical property and equipment that was in his possession or under his control, including all computers, flash drives, hard drives, and phones.

121.    Silvers refused to comply.

122.    Kaplin made the same demand again on May 17, 2021.

123.    Again, Silvers refused to comply.

## COUNT I
## BREACH OF ORAL CONTRACT

124.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 123, as if fully set forth herein.

125.    The oral agreement between Kaplin and Silvers to build the DEX (the "Agreement") was a valid and enforceable contract.

126.    Kaplin fully performed his obligations under the Agreement.

127.    Silvers breached the Agreement when he failed to build the code for the DEX.

128.    As a result of Silvers' breach, Kaplin and the Companies suffered damages.

WHEREFORE, the Plaintiffs, Alexander Kaplin, Bendtrand Global Services S.A., and Runner Runner LLC pray that this Court enter a judgment in their favor and against the Defendant, Daniel Silvers, in the amount to be determined at trial, together with interest and costs of this action, and any other relief that the Court deems just and proper.

## COUNT II
## FRAUD

129.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 123, as if fully set forth herein.

130.    Silvers made numerous false statements of material fact.

131.    Silvers knew that his statements were false.

132.    On multiple occasions, Silvers stated to Kaplin that he was coding "day and night" knowing that his statements were false.

133.    On multiple occasions, Silvers stated to Kaplin that the DEX was almost completed knowing that his statements were false.

134.    On multiple occasions, Silvers stated to Kaplin that Silvers was building a technology that was unique and innovative, knowing that his statements were false.

135.    Silvers intended to and, in fact, did induce Kaplin to reasonably rely and act on the false statements.

136.    Silvers' pattern of deception constitutes a scheme to defraud.

137.     Silvers' fraudulent conduct resulted in damages to Kaplin and the Companies.

WHEREFORE, the Plaintiffs, Alexander Kaplin, Bendtrand Global Services S.A., and Runner Runner LLC pray that this Court enter a judgment in their favor and against the Defendant, Daniel Silvers, in the amount to be determined at trial, together with interest and costs of this action, and any other relief that the Court deems just and proper.

## COUNT III
## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030(a)(5)(C) ("CFAA")

138.    Plaintiffs incorporates by reference the allegations contained in paragraphs 1 through 123, as if fully set forth herein.

139.    Silvers violated CFAA when he gained access to Kaplin's personal computer, without Kaplin's knowledge or permission.

140.    Silvers further violated CFAA when he unilaterally and without notice, cut off Kaplin and software developers' access to their email accounts.

141.    Silvers further violated CFAA, when he blocked the software developers' access to Jira knowledge management software and a database containing the code.

142.    Silvers' conduct caused impairment to the integrity or availability of data and information.

143.    Silvers' conduct caused a loss in excess of $5,000.

144.    The loss consisted of the expenses Kaplin and the Companies incurred in responding to the offense, conducting a damage assessment, and restoring the systems to their condition prior to the offense.

WHEREFORE, the Plaintiffs, Alexander Kaplin, Bendtrand Global Services S.A., and Runner Runner LLC pray that this Court enter a judgment in their favor and against the Defendant, Daniel Silvers, in the amount to be determined at trial, together with interest and costs of this action, and any other relief that the Court deems just and proper.

**COUNT IV**
**<u>CONVERSION</u>**

145.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 123, as if fully set forth herein.

146.     Kaplin and the Companies had a right to the property, which included the code and all documentation related to the code; all backup documentation and technical specs; email communications and video recordings; computers, flash drives, hard drives, and phones.

147.     Kaplin and the Companies had an absolute and unconditional right to the immediate possession of this property.

148.     Kaplin made numerous demands for possession of the property.

149.     Silvers wrongfully and without authorization assumed control, dominion, or ownership of the property.

WHEREFORE, the Plaintiffs, Alexander Kaplin, Bendtrand Global Services S.A., and Runner Runner LLC pray that this Court enter a judgment in their favor and against the Defendant, Daniel Silvers, in the amount to be determined at trial, together with interest and costs of this action, and any other relief that the Court deems just and proper.

**COUNT V**
**<u>UNJUST ENRICHMENT</u>**

150.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 123, as if fully set forth herein.

151.    Silvers received compensation for the FP, but did not complete his work on the FP.

152.    Silvers also received an interest-free loan from Kaplin in the amount of $340,000.

153.    Silvers' retention of the benefit he has received violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, the Plaintiffs, Alexander Kaplin, Bendtrand Global Services S.A., and Runner Runner LLC pray that this Court enter a judgment in their favor and against the Defendant, Daniel Silvers, in the amount to be determined at trial, together with interest and costs of this action, and any other relief that the Court deems just and proper.


Date:   September 12, 2021                              Alexander Kaplin, Bendtrand
                                                       Global Services S.A., Runner
                                                       Runner LLC

                                                       By: /s/  Svetlana Kaplina
                                                       One of their Attorneys


Svetlana Kaplina
ARDC# 6293095
Elan Law Group
1101 S. State St., #1004
Chicago, IL 60603
Phone: (312) 934-6009