**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| BENDTRAND GLOBAL SERVICES S.A., ) <br> RUNNER LLC and ALEXANDER KAPLIN ) <br> ) <br>     Plaintiffs, ) <br> ) <br>     v. ) <br> ) <br> DANIEL SILVERS, ) <br> ) <br>     Defendant. ) <br> ) | Case No: 21-CV-4684 |

**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM TO COMPLAINT**

Defendant Daniel Silvers, in Response to Plaintiffs Bentrand Global Services, S.A., Runner Runner, LLC and Alexander Kaplin's for its Answer, Affirmative Defenses, and Counterclaim to Complaint filed by Bendtrand Global Services, S.A., Road Runner, LLC, and Alexander Kaplin ("Plaintiffs"), states as follows:

**PARTIES**

1. Plaintiff, Alexander Kaplin ("Kaplin"), is a natural person and a resident of Florida.

**ANSWER:** Admitted

2. Plaintiff, Runner Runner LLC ("Runner") is a Wyoming limited liability company. Kaplin is the sole member of Runner.

**ANSWER:** Admitted

3. Plaintiff, Bentrand Global Services S.A. ("Bentrand") is a Panamanian corporation. Kaplin is the sole shareholder of Bentrand.

**ANSWER:** Admitted

4. Defendant, Daniel Silvers ("Silvers") is a natural person and a resident of Chicago, Illinois.

**ANSWER:** Admitted

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(3), because the case is between citizens of different states in which a subject of a foreign state is an additional party.

**ANSWER:** Admitted

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), because the only Defendant in this action resides in Chicago, Illinois.

**ANSWER:** Admitted

**FACTS COMMON TO ALL COUNTS**
**Kaplin and Silvers: Relationship and Background Facts**

7. Kaplin has been working as a trader, specializing in domestic exchange-traded funds ("ETF") for about thirteen years.

**ANSWER:** Admitted

8. Prior to working as a trader, Kaplin worked on the American Stock Exchange as a specialist, making markets in domestic ETFs.

**ANSWER:** Admitted

9. Kaplin and Silvers met through a mutual acquaintance in or about 2010.

**ANSWER:** Admitted

10. At that time, Kaplin and another individual (collectively the "Traders") worked together trading domestic ETFs.

**ANSWER:** Denied. The Complaint does not say who this "individual" is.

11. When Kaplin and Silvers met, Silvers represented that he was a software specialist with extensive experience in building software programs used in trading and analysis of financial products.

**ANSWER:** Admitted

12. Among other things, Silvers said he had worked as a software specialist for the New York Stock Exchange and the Intercontinental Exchange.

**ANSWER:** Admitted

13. Following a few discussions with Silvers, the Traders retained Silvers to build certain software for them.

**ANSWER:** Admitted as to Kaplin retaining Silvers, denied as to any unknown "trader"

14. When trading ETFs, the Traders used data provided by the National Securities Clearing Corporation (the "NSCC") to price EFTs.

**ANSWER:** Denied. The Complaint does not say who this "trader" is.

15. The software – referred to as the "parser" – would automatically parse raw data provided in the NSCC files allowing the Traders to price ETFs in an excel spreadsheet.

**ANSWER:** Admitted.

16. Silvers built the parser to the Traders' satisfaction.

**ANSWER:** Denied. The Complaint does not say who this "trader" is.

17. While Silvers was working on the parser, he and Kaplin became friends and began to socialize on a regular basis.

**ANSWER:** Admitted.

18. In or about 2016, when Silvers moved to Chicago, the parties continued to maintain their relationship, and Silvers and his wife travelled to visit and stay with Kaplin in his house in Roxbury, Connecticut.

**ANSWER:** Admitted.

19. In or about 2017, the Traders retained Silvers to build software that would allow them to price ETFs in real time.

**ANSWER:** Denied. The Complaint does not say who this "trader" is.

20. Silvers agreed to build the software, referred to as the fair pricer (the "FP"), for twenty thousand dollars.

**ANSWER:** Denied.

21. The Traders paid Silvers up front, and Silvers spent a couple of weeks at Kaplin's Connecticut house working on the project.

**ANSWER:** Denied. The Complaint does not say who this "trader" is.

22. After the work was completed, the FP did not function properly, crashing and freezing on a regular basis.

**ANSWER:** Denied.

23. Silvers explained that the problem was caused by Bloomberg's application programming interface and that it would cost an additional ten thousand dollars to fix the FP.

**ANSWER:** Denied.

24. The Traders paid Silvers the additional amount, but Silvers kept delaying the work, citing various obstacles.

**ANSWER:** Denied.

**Kaplin and Silvers Decide to Build a Decentralized Cryptocurrency Exchange**

25. In 2017, cryptocurrency exchanges were becoming mainstream, but in Kaplin's opinion, they were poorly designed.

**ANSWER:** Denied.

26. The exchanges were difficult to use, and trading on them required many unnecessary steps, each prone to error.

**ANSWER:** Denied.

27. It was as though the exchanges were designed by software programmers who were unfamiliar with trading.

**ANSWER:** Denied.

28. Kaplin wondered whether it was possible to build an exchange that was fast and had a simple and use-friendly trading interface.

**ANSWER:** Denied.

29. In or about December of 2017, Kaplin shared his thoughts with Silvers, and Silvers expressed a lot of interest in the idea.

**ANSWER:** Denied. Kaplin shared his interests in the idea in February 2018 when he came to Chicago.

30. Silvers said it was possible to build such an exchange, and it was not particularly complicated, given Silvers' knowledge and experience.

**ANSWER:** Admitted in part. It was possible to build such an exchange, denied it was not particularly complicated

31. If Kaplin was willing to finance the project, Silvers said he would be able to build a functional model of an exchange within six months.

**ANSWER:** Denied

32. Following a few discussions, in or about the beginning of 2018, Kaplin and Silvers decided to work together to build a decentralized crypto-currency exchange (the "DEX").

**ANSWER:** Admitted in part. Denied crypto-currency exchange, it was a crypto-token exchange.

33. Generally, a cryptocurrency exchange is a platform that facilitates trading of digital assets.

**ANSWER:** Admitted.

34. Such a platform can be centralized or decentralized.

**ANSWER:** Admitted.

35. A centralized exchange involves an intermediary that acts as both a middleman and a custodian of the digital assets.

**ANSWER:** Admitted.

36. By contrast, decentralized platforms are non-custodial and allow for direct transactions between the interested parties, without any intermediary or central authority.

**ANSWER:** Denied.

37. Since there is no intermediary, decentralized exchanges are built on a blockchain, and they employ smart contracts that self-execute under set conditions.

**ANSWER:** Admitted.

**Kaplin and Silvers Reach an Agreement**

38. Between February and March of 2018, Kaplin made a few trips to Chicago to discuss and negotiate the terms of the project.

**ANSWER:** Admitted.

39. During these discussions, the parties agreed that Silvers would build the code for a basic version of a DEX.

**ANSWER:** Admitted.

40. The parties agreed that the work would be completed by August of 2018.

**ANSWER:** Denied.

41. Silvers specifically stated to Kaplin: "if you give me until August [2018] and guarantee that you will cover all the expenses until then, I will give you a functional model of the DEX."

**ANSWER:** Denied.

42. It was agreed that Silvers would hire a few developers outside of the U.S. to assist Silvers with building the code, and Kaplin would pay their compensation.

**ANSWER:** Denied. Kaplin hired and paid for developers inside and outside of the U.S.

43. It was further agreed that Kaplin would purchase all the necessary computer equipment, pay for the rental of an office space and cover other similar expenses.

**ANSWER:** Admitted.

44. In addition, Kaplin would advance to Silvers $9,000 per month in the form of an interest-free loan.

**ANSWER:** Denied. The payment was not a loan.

45. The parties further agreed that once a functional version of the platform was built, the ownership rights to the technology would be transferred to a new company ("Newco"), and Kaplin and Silvers would become equal shareholders of the company.

**ANSWER:** Denied.

46. After that, Newco would raise additional funds that would be used to finish the project.

**ANSWER:** Denied.

47. The parties estimated that Kaplin's total investment would not exceed $250,000.

**ANSWER:** Denied.

48. The parties agreed that Silvers' work on the FP would also be completed by August 2018.

**ANSWER:** Denied.

### Silvers Engages in a Continuous Course of Deceit and Misrepresentations

49. Once the basic terms were agreed upon, Silvers commenced his work on building the DEX.

**ANSWER:** Admitted.

50. He identified and retained software developers.

**ANSWER:** Admitted to identified, denied to retained software developers.

51. He asked Kaplin to purchase various computer equipment and rent offices in two locations, including Chicago, and eventually, Panama City.

**ANSWER:** Admitted to Silvers renting office in Chicago, denied Panama City.

52. Initially, Kaplin retained legal counsel to draft and review contracts with the independent contractors and vendors.

**ANSWER:** Admitted.

53. Silvers, however, said he could handle all such matters himself, because in his prior employment, he worked closely with attorneys and legal departments.

**ANSWER:** Denied.

54. All the expenses were paid by Kaplin personally, and/or by Bentrand and Runner (collectively, the "Companies").

**ANSWER:** Admitted.

55. In or about July of 2018, Silvers said he could not complete the project within the agreed upon time, because he had encountered various difficulties and unanticipated hurdles.

**ANSWER:** Denied.

56. Among other things, Silvers blamed software developers, who were allegedly "not as good as [he] thought they would be."

**ANSWER:** Denied.

57. According to Silvers, he worked "day and night" on building the code and needed just a little more time to complete the project.

**ANSWER:** Denied.

58. He promised that things would go faster once he was able to assemble a better team.

**ANSWER:** Denied.

59. In or about December of 2018, Kaplin got suspicious about Silvers' ability to perform.

**ANSWER:** Denied.

60. At the time, Kaplin and Silvers were in Eastern Europe, meeting with a group of individuals who were engaged in various crypto projects.

**ANSWER:** Admitted.

61. During one of the meetings, Silvers was asked questions about the DEX code, which he appeared to be unable to answer.

**ANSWER:** Denied.

62. After the meeting, Kaplin confronted Silvers, explaining his concerns.

**ANSWER:** Denied.

63. Silvers assured Kaplin that the only reason Silvers did not answer some questions at the meeting was that he did not want to reveal certain confidential information about the DEX code.

**ANSWER:** Denied.

64. Relying on Silvers' representations, Kaplin continued to finance the project.

**ANSWER:** Denied.

65. In anticipation that a functional version of the DEX would be built soon, Kaplin continued to maintain offices, pay compensation to the employees, and pay various other service providers.

**ANSWER:** Denied.

66. In addition, capitalizing on his personal relationship, Kaplin spent time and resources trying to recruit blockchain and crypto influencers to conduct public relations work for the project.

**ANSWER:** Denied.

67. Furthermore, Kaplin bore the cost of various crypto conferences and summits in Europe, South Korea, and Singapore, which Silvers said were necessary to attend.

**ANSWER:** Denied.

68. As it later turned out, some of Silvers' "business" travels were for his personal benefit, including a trip to South Korea, where Silvers travelled to meet with a woman, who had previously lived in Chicago, and whom he had been dating.

**ANSWER:** Denied. I have never been to South Korea! I never used the project budget for my own benefit.

69. While Silvers continued to reside and work out of the office in Chicago, he travelled to Panama City frequently at Kaplin's expense.

**ANSWER:** Admitted.

70. In or about March of 2020, Silvers stated that it was necessary for him to spend more time in Panama and requested that Kaplin rent an apartment for him in Panama City.

**ANSWER:** Denied.

71. Starting at the end of 2018, Kaplin regularly raised concerns about continuous delays, missed deadlines, and having to spend more money than he had planned or anticipated.

**ANSWER:** Denied.

72. Silvers always had excuses for the delays and the alleged setbacks, and always said the DEX was almost completed.

**ANSWER:** Denied.

73. He continuously assured Kaplin that the DEX would be truly unique and innovative.

**ANSWER:** Denied.

74. Nonetheless, as a result of Kaplin's frequent complaints about continuous delays, Silvers agreed to reduce his shares in Newco to 25%, and eventually to 12.5%.

**ANSWER:** Denied.

75. As the delays continued into 2019 and 2020, Kaplin requested that the project be placed on hold to allow parties to regroup and seek outside investment.

**ANSWER:** Denied.

76. Silvers always resisted this idea, citing various technical reasons as to why putting the project on hold was not beneficial or even possible.

**ANSWER:** Denied.

77. By the end of 2020, Kaplin expressed to Silvers that unless a functional version of the DEX was completed within the next few months, he would not be able to continue to provide financing.

**ANSWER:** Denied.

78. Silvers assured Kaplin that the project would be completed by no later than April 15, 2021, and that it was a firm deadline.

**ANSWER:** Denied.

79. On or about March 1, 2021, Kaplin engaged legal counsel to form Newco in the U.S. and to conduct a legal review ensuring that the first version of the DEX would be in compliance with all applicable U.S. laws.

**ANSWER:** Denied.

80. Silvers once again resisted legal counsel's involvement.

**ANSWER:** Denied.

81. He told Kaplin, as he had done before, that he had an extensive knowledge and familiarity with all the potentially applicable legal issues, because as part of his prior employment, he "worked closely with legal and compliance."

**ANSWER:** Denied.

82. He told Kaplin that the attorney's involvement was unnecessary and a waste of his time.

**ANSWER:** Denied.

83. In communication with legal counsel, Silvers was evasive and reluctant to provide basic information about the code.

**ANSWER:** Denied.

84. When he was asked to prepare a spreadsheet describing the technology and was given specific directions as to what data the spreadsheet must contain, Silvers provided irrelevant and incomplete information.

**ANSWER:** Denied.

85. Gradually, it became apparent that Silvers had failed to do what he had promised.

**ANSWER:** Denied.

86. First, it became apparent that – contrary to Silvers' numerous representations that he was coding "day and night" – Silvers did not do much coding.

**ANSWER:** Denied.

87. Software developers, who worked for the Companies under Silvers, reported that, all in all, Silvers built less than half percent of the code.

**ANSWER:** Denied.

88. Silvers' participation consisted of instructing the developers as to what features they were expected to build.

**ANSWER:** Denied.

89. His instructions were erratic, inconsistent, and often caused the developers to raise their eyebrows.

**ANSWER:** Denied.

90. Further, it became apparent that Silvers' continuous representations that a functional DEX was almost completed turned out to be a blatant lie.

**ANSWER:** Denied.

91. In actuality, from the beginning of 2018 until March of 2021, the developers were mostly working on building a blockchain.

**ANSWER:** Denied.

92. Based on the developers' reports, in the beginning of 2021 the blockchain was still incomplete and was "not connecting properly."

**ANSWER:** Denied.

93. Based on the developers' reports, they "did not even touch smart contracts" – the very foundation of any DEX – until the beginning of 2021.

**ANSWER:** Denied.

94. One developer did work on a front-end feature of the DEX, primarily consisting of a crypto wallet, but the wallet was never completed.

**ANSWER:** Denied.

95. Based on the developers' reports, substantial resources were dedicated to building various blockchain functionalities that were completely unrelated to the DEX, but none of the features were ever completed.

**ANSWER:** Denied.

96. In addition, none of the features were approved or authorized by Kaplin.

**ANSWER:** Denied.

97. Further investigation revealed that the code was not properly documented.

**ANSWER:** Denied.

98. Moreover, pursuant to Silvers' instructions, the developers incorporated hundreds of open-source software into the code without any review or understanding of the applicable licensing restrictions.

**ANSWER:** Denied.

99. With respect to the FP, which was finished in the summer of 2020, contrary to his representations, Silvers did not do any work on the FP himself.

**ANSWER:** Denied.

100. Even though Silvers received full compensation for the FP back in 2017, he never completed the work.

**ANSWER:** Denied.

101. Instead, unbeknownst to Kaplin, Silvers directed one of the developers to work on the FP.

**ANSWER:** Denied.

102.      Pursuant to Silvers' direction, the developer equipped the FP with unnecessary features which were never requested or authorized by the Traders.

**ANSWER:** Denied.

103.      Kaplin continues to pay the developer, who is currently working on removing these features.

**ANSWER:** Denied.

**Silvers Engages in Further Illegal Conduct**

104.      In or about March of 2021, as it was becoming apparent that Silvers had failed to perform as promised, Silvers' behavior became erratic.

**ANSWER:** Denied.

105.      Among other things, Silver denied that he agreed to 12.5% in Newco, stating that it was Kaplin who should get 12.5% because the code was Silvers' "baby."

**ANSWER:** Denied.

106.      He proclaimed that he could have been making $400,000 per year, but instead was working for "nothing" and demanded that Kaplin pay him salary and benefits.

**ANSWER:** Denied.

107.      At one time, he told Kaplin that it did not matter that the DEX was never built, because the technology that he built was far superior.

**ANSWER:** Denied.

108.      Kaplin, however, could not possibly understand it, because he did not know "anything about technology."

**ANSWER:** Denied.

109.      When Kaplin responded, noting that he spent about $1.4 million paying for something he did not agree to, Silvers stated that this also did not matter, because $1.4 million was "nothing" to Kaplin who could "make a million in a day."

**ANSWER:** Denied.

110.     When Kaplin scheduled a meeting with potential purchasers of the technology in an attempt to recover some of his losses, Silvers failed to show up, falsely claiming that he was ill and had to go to the hospital.

**ANSWER:** Denied.

111.     On or about May 1, 2021, after yet another conflicted conversation with Kaplin, Silvers stated that Kaplin was "no longer needed," and that he had only been "hurting the project" with his insistence on deadline and deliverables.

**ANSWER:** Denied.

112.     Silvers declared that because Kaplin did not know "anything about technology," Silvers would not give him the code.

**ANSWER:** Denied.

113.     As proof that Kaplin knew nothing about technology, Silvers stated that he always had access to Kaplin's personal computer, without Kaplin's knowledge.

**ANSWER:** Denied. TeamViewer.com program which Kaplin's installed himself on his computers prevents any unauthorized access. Silvers never access Kaplin's computer without Kaplin's authorization.

114.     A few minutes later, Silvers unilaterally and without notice, cut off Kaplin and software developers' access to their email accounts.

**ANSWER:** Denied.

115.     In addition, Silvers cut off the software developers' access to Jira knowledge management software and a database containing the code.

**ANSWER:** Denied.

116.     Furthermore, Silvers cut off Kaplin's access to other Companies' business records and accounts.

**ANSWER:** Denied.

117.     In addition, on the same day, acting through an agent in Panama City, Silvers confiscated a computer from one of the software developers working from Panama City.

**ANSWER:** Denied.

118.     On or about May 1, 2021, Kaplin, via an email and certified letter, demanded that Silvers restore Kaplin's access to the code, emails and other accounts.

**ANSWER:** Admitted.

119.     Kaplin also demanded that Silvers return all of the Companies' property and assets that were in Silvers' possession, including, documentation related to the source code; all backup documentation and technical specs; email communications and video recordings; passwords and admin rights to hosting, domain names, Jira knowledge management software, and other cloud-based and physical systems.

**ANSWER:** Admitted.

120.     Kaplin also demanded that Silvers return and surrender all physical property and equipment that was in his possession or under his control, including all computers, flash drives, hard drives, and phones.

**ANSWER:** Admitted.

121.     Silvers refused to comply.

**ANSWER:** Denied.

122.     Kaplin made the same demand again on May 17, 2021.

**ANSWER:** Denied.

123.     Again, Silvers refused to comply.

**ANSWER:** Denied.


**COUNT I**
**BREACH OF ORAL CONTRACT**

124.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 123, as if fully set forth herein.

**ANSWER:** Defendant restates his answers to paragraphs 1 through 123 as if fully restated herein.

125.     The oral agreement between Kaplin and Silvers to build the DEX (the "Agreement") was a valid and enforceable contract.

**ANSWER:** Denied.

126.     Kaplin fully performed his obligations under the Agreement.

**ANSWER:** Denied.

127.     Silvers breached the Agreement when he failed to build the code for the DEX.

**ANSWER:** Denied.

128.     As a result of Silvers' breach, Kaplin and the Companies suffered damages.

**ANSWER:** Denied.

## COUNT II
## FRAUD

### Dismissed with Prejudice

### COUNT III
### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030(a)(5)(C) ("CFAA")

138. Plaintiffs incorporates by reference the allegations contained in paragraphs 1 through 123, as if fully set forth herein.

**ANSWER:** Defendant restates his answers to paragraphs 1 through 123 as if fully restated herein.

139. Silvers violated CFAA when he gained access to Kaplin's personal computer, without Kaplin's knowledge or permission.

**ANSWER:** Denied. TeamViewer.com program which Kaplin's installed himself on his computers prevents any unauthorized access. Silvers never access Kaplin's computer without Kaplin's authorization.

140. Silvers further violated CFAA when he unilaterally and without notice, cut off Kaplin and software developers' access to their email accounts.

**ANSWER:** Denied.

141. Silvers further violated CFAA, when he blocked the software developers' access to Jira knowledge management software and a database containing the code.

**ANSWER:** Denied.

142. Silvers' conduct caused impairment to the integrity or availability of data and information.

**ANSWER:** Denied.

143. Silvers' conduct caused a loss in excess of $5,000.

**ANSWER:** Denied.

144. The loss consisted of the expenses Kaplin and the Companies incurred in responding to the offense, conducting a damage assessment, and restoring the systems to their condition prior to the offense.

**ANSWER:** Denied.

## COUNT IV
## CONVERSION

145. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 123, as if fully set forth herein.

**ANSWER:** Defendant restates his answers to paragraphs 1 through 123 as if fully restated herein.

146. Kaplin and the Companies had a right to the property, which included the code and all documentation related to the code; all backup documentation and technical specs; email communications and video recordings; computers, flash drives, hard drives, and phones.

**ANSWER:** Denied.

147. Kaplin and the Companies had an absolute and unconditional right to the immediate possession of this property.

**ANSWER:** Denied.

148. Kaplin made numerous demands for possession of the property.

**ANSWER:** Denied.

149. Silvers wrongfully and without authorization assumed control, dominion, or ownership of the property.

**ANSWER:** Denied.

## COUNT V
## UNJUST ENRICHMENT

**Dismissed with Prejudice**

17

**FIRST AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred in whole or in part by the doctrine of estoppel.

**SECOND AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred in whole or in part by the doctrine of unjust enrichment, as Plaintiffs' retention of the software developed by Defendant would be unjust if Plaintiffs' also recovered damages for breach of contract.

**THIRD AFFIRMATIVE DEFENSE**

Plaintiffs' Complaint fails to state any claim upon which relief can be granted.

**FOURTH AFFIRMATIVE DEFENSE**

The claims of Plaintiffs are time-barred, in whole or in part, under the applicable statute of limitations, statute of repose and/or by the doctrines of waiver, estoppel and/or laches.

**FIFTH AFFIRMATIVE DEFENSE**

Count I is barred by the Statute of Frauds

**SIXTH AFFIRMATIVE DEFENSE**

Plaintiffs are barred from recovery, in whole or in part, due to the intervening cause of another party.

**SEVENTH AFFIRMATIVE DEFENSE**

The claims in Plaintiffs' Complaint are barred, in whole or in part, to the extent any injury sustained by Plaintiffs was caused by their own conduct.

**EIGHTH AFFIRMATIVE DEFENSE**

Plaintiffs who have sold, destroyed, damaged, altered or otherwise disposed of the technology developed by Defendant are barred, in whole or in part, from recovery.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs' damages are solely the result of Kaplin's own actions, unwillingness to comply with U.S. regulations in order to complete the DEX and terminating Defendant with no pay as agreed.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the doctrines of unclean hands, and *in pari delicto.*

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred due to its failure to mitigate damages, if any.

WHEREFORE, Defendant/Counter-Plaintiff, Daniel Silvers respectfully requests that this Court enter an order dismissing with Plaintiffs' Complaint.

## COUNTERCLAIM OF DANIEL SILVERS

Counterclaim Plaintiff, Daniel Silvers. (hereinafter referred to as "Silvers"), for its Counterclaim against Runner Runner, LLC ("Runner") and Alexander Kaplin state as follows:

## NATURE OF THE ACTION

1.     Plaintiffs allege Defendant was engaged by Plaintiffs to develop a technology platform and in consideration of this work Plaintiffs paid Defendant $9,000 per month for this work.

2.     The Counterclaim seeks damages for Plaintiff's failure to make the monthly payment as agreed for the entire term of Defendant's work on the project.

## PARTIES

3.     Counter-Plaintiff, Daniel Silvers ("Silvers") is a natural person and a resident of Chicago, Illinois.

4.     Counter-Defendant, Alexander Kaplin ("Kaplin") is a natural person and a resident of Florida.

5.     Counter-Defendant, Runner Runner LLC ("Runner") is a Wyoming limited liability company. Kaplin is the sole member of Runner.

## JURISDICTION AND VENUE

6.     This Court has diversity jurisdiction over each of Silver's claims pursuant to 28 U.S.C. §1332 as the amount in controversy exceeds $75,000.00 exclusive of costs and interest, and the parties are citizens of different states, this court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

7.     The venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events or omissions giving rise to the claims in this litigation occurred in this district.

### BACKGROUND

8.     Kaplin, through his personal account and then through his limited liability company Runner, engaged Silvers to build the DEX as alleged in Plaintiff's Complaint.

9.     Construction of the DEX is an extremely complex process requiring a high degree of skill and experience.

10.    Silvers was paid $9,000 per month considering his work for Kaplin and Runner.

11.    The payment was made twice a month from Runner on the 15th and the last day of each month beginning when work concluded.

12.    For March 2021, Runner paid only $6,000.

13.    For April 2021, Runner paid only $3,000.

14.    No payments have been made since April by Runner.

15.    Silvers was not paid for his earned vacation and sick time at the time of his termination.

16.    Despite not being paid as agreed, Silvers continued to work on the project without pay by Runner.

### COUNT I
### BREACH OF CONTRACT
### *Kaplin v. Runner*

17.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 16 of this Counterclaim as Paragraph 17 of Counterclaim as though fully set forth herein.

18.    Runner offered Silvers a $9,000 monthly payment in consideration of his work to construct a DEX.

19.    Silvers accepted Runner's offer and diligently worked on the DEX, and was paid $4,500 on the 15th and the last day of each month for over a year.

20.    At all times, Silvers has complied with the terms of the Agreement.

21.    For March 2021, Runner paid only $6,000.

22.    For April 2021, Runner paid only $3,000.

23.    No payment was made on April 31, 2021, and no payments have been made since.

24.    As a result of the Runner's breaches of the Agreement, Silvers has been damaged in an amount to be proven at trial.

WHEREFORE, Counter-Plaintiff, DANIEL SILVERS respectfully requests that this Court enter judgment in his favor and against Counter-Defendants, Alexander Kaplin, RUNNER RUNNER, LLC and, in an amount in excess of $50,000 plus pre-judgment interest and for any other such relief that the Court finds necessary or proper under the circumstances.

### COUNT II
### VIOLATION OF ILLINOIS WAGE PAYMENT AND COLLECTION ACT
### 820 ILCS 115/ *et seq.*
### *Silvers v. Runner and Kaplin*

25.    Counter-Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 23 of this Counterclaim as Paragraph 25 of this Counterclaim as though fully set forth herein.

26.    Silvers was an "employee" under the Act.

27.    The Company Defendants, Runner and Kaplin are "employers" under the Act.

28.     Pursuant to the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq.*, which the Company Defendants have violated, Silvers is entitled to be compensated for the final compensation owed to him.

29.     As a result of the Company Defendants' breach, Silvers has been damaged in an amount in excess of $50,000, in direct violation of 820 ILCS 115/4 & 115/5.

30.     820 ILCS 115/13 provides:

"In addition to an individual who is deemed to be an employer pursuant to Section 2 of this Act, any officers of a corporation or agents of an employer who knowingly permits such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation."

31.     Kaplin, as the controlling unitholder and/or agent of the Runner, knowingly permitted the Runner not to pay Silvers's earned compensation.

32.     To date, penalties pursuant to 820 ILCS 115/1 *et seq* total in excess of $50,000.

WHEREFORE, Counter-Plaintiff, DANIEL SILVERS respectfully requests that this Court enter judgment in its favor and against Defendants, BENDTRAND GLOBAL SERVICES S.A.,), RUNNER LLC, and ALEXANDER KAPLIN in an amount in excess of $75,000 inclusive of interest as provided for by the Illinois Attorneys' Fees in Wage Actions Act, 705 ILCS 225/1, five percent per month, and attorneys' fees for any other such relief that the Court finds necessary or proper under the circumstances.

Dated September 16, 2022         Respectfully submitted,

**DANIEL SILVERS,**
Defendant/Counter-Plaintiff

By:     /s/*Alexander N. Loftus*
       One of His Attorneys

Alexander Loftus, Esq.
David Eisenberg, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark St., Suite 1600
Chicago, Illinois 60601
T: 312.899.6625
C: 312.772.5396
alex@loftusandeisenberg.com
david@loftusandeisenberg.com