UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Bendtrand Global Services S.A., Runner Runner LLC and Alexander Kaplin | ) ) ) | |
| Plaintiffs | ) | Case No. 21-CV-4684 |
| v. | ) ) | Honorable Harry D. Leinenweber Judge Presiding |
| | ) | |
| Daniel Silvers a/k/a Daniil Girell | ) ) | **JURY TRIAL DEMANDED** |
| Defendant | ) | |

**AMENDED COMPLAINT**

Plaintiffs, Bendtrand Global Services S.A., Runner Runner LLC and Alexander Kaplin, by and through their attorney Gene Hook Jr., submit this Amended Complaint against the Defendant, Daniel Silvers a/k/a Daniil Girell, pursuant to Fed. R. Civ. P. 15(a)(2), and in support thereof as follows:

1. Plaintiff, Alexander Kaplin ("Kaplin"), is a natural person and was a resident of Florida at the commencement of this action.

2. Plaintiff, Runner Runner LLC ("Runner") is a Wyoming limited liability company. Kaplin is the sole member of Runner.

3. Plaintiff, Bendtrand Global Services S.A. ("Bendtrand") is a Panamanian corporation. At all relevant times, Bendtrand maintained its main office in Panama City, Panama. Kaplin is the sole shareholder of Bendtrand.

4. Defendant, Daniel Silvers a/k/a Daniil Girell ("Silvers") is a natural person and a resident of Chicago, Illinois.

1

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(3), because the case is between citizens of different states in which a subject of a foreign state is an additional party.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), because the only Defendant in this action resides in Chicago, Illinois.

## FACTS COMMON TO ALL COUNTS

### Kaplin and Silvers: Relationship and Background Facts

7.     Kaplin has been working as a trader, specializing in domestic exchange-traded funds ("ETF") for about thirteen years.

8.     Prior to working as a trader, Kaplin worked on the American Stock Exchange as a specialist, making markets in domestic ETFs.

9.     Kaplin and Silvers met through a mutual acquaintance in or about 2010.

10.    At that time, Kaplin and another individual, Stas Finelt (collectively the "Traders") worked together trading domestic ETFs.

11.    When Kaplin and Silvers met, Silvers represented that he was a software specialist with extensive experience in building software programs used in trading and analysis of financial products.

12.    Among other things, Silvers said he had worked as a software specialist for the New York Stock Exchange and the Intercontinental Exchange.

13.    Following a few discussions with Silvers, the Traders retained Silvers to build certain software for them.

14.    When trading ETFs, the Traders used data provided by the National Securities Clearing Corporation (the "NSCC") to price EFTs.

15. The software – referred to as the "parser" – would automatically parse raw data provided in the NSCC files allowing the Traders to price ETFs in an excel spreadsheet.

16. Silvers built the parser to the Traders' satisfaction.

17. While Silvers was working on the parser, he and Kaplin became friends and began to socialize on a regular basis.

18. In or about 2016, when Silvers moved to Chicago, the parties continued to maintain their relationship, and Silvers and his wife travelled to visit and stay with Kaplin in his house in Roxbury, Connecticut.

19. In or about 2017, the Traders retained Silvers to build software that would allow them to price ETFs in real time.

20. Silvers agreed to build the software, referred to as the fair pricer (the "FP"), for twenty thousand dollars.

21. The Traders paid Silvers up front, and Silvers spent a couple of weeks at Kaplin's Connecticut house working on the project.

22. After the work was completed, the FP did not function properly, crashing and freezing on a regular basis.

23. Silvers explained that the problem was caused by Bloomberg's application programming interface and that it would cost an additional ten thousand dollars to fix the FP.

24. The Traders paid Silvers the additional amount, but Silvers kept delaying the work, citing various obstacles.

**Kaplin and Silvers Decide to Build a Decentralized Cryptocurrency Exchange**

25. In 2017, cryptocurrency exchanges were becoming mainstream, but in Kaplin's opinion, they were poorly designed.

26. The exchanges were difficult to use, and trading on them required many unnecessary steps, each prone to error.

27. It was as though the exchanges were designed by software programmers who were unfamiliar with trading.

28. Kaplin wondered whether it was possible to build an exchange that was fast and had a simple and use-friendly trading interface.

29. In or about December of 2017, Kaplin shared his thoughts with Silvers, and Silvers expressed a lot of interest in the idea.

30. Silvers said it was possible to build such an exchange, and it was not particularly complicated, given Silvers' knowledge and experience.

31. If Kaplin was willing to finance the project, Silvers said he would be able to build a functional model of an exchange within six months.

32. Following a few discussions, in or about the beginning of 2018, Kaplin and Silvers decided to work together to build a decentralized crypto-currency exchange (the "DEX").

33. Generally, a cryptocurrency exchange is a platform that facilitates trading of digital assets.

34. Such a platform can be centralized or decentralized.

35. A centralized exchange involves an intermediary that acts as both a middleman and a custodian of the digital assets.

36. By contrast, decentralized platforms are non-custodial and allow for direct transactions between the interested parties, without any intermediary or central authority.

37. Since there is no intermediary, decentralized exchanges are built on a blockchain, and they employ smart contracts that self-execute under set conditions.[1]

### Kaplin and Silvers Reach an Agreement

38. Between February and March of 2018, Kaplin made a few trips to Chicago to discuss and negotiate the terms of the project.

39. During these discussions, the parties agreed that Silvers would build the code for a basic version of a DEX.

40. The parties agreed that the work would be completed by August of 2018.

41. Silvers specifically stated to Kaplin: "if you give me until August [2018] and guarantee that you will cover all the expenses until then, I will give you a functional model of the DEX."

42. It was agreed that Silvers would hire a few developers outside of the U.S. to assist Silvers with building the code, and Kaplin would pay their compensation.

43. It was further agreed that Kaplin would purchase all the necessary computer equipment, pay for the rental of an office space and cover other similar expenses.

44. In addition, Kaplin would advance to Silvers $9,000 per month in the form of an interest-free loan.

45. The parties further agreed that once a functional version of the platform was built, the ownership rights to the technology would be transferred to a new company ("Newco"), and Kaplin and Silvers would become equal shareholders of the company.

46. After that, Newco would raise additional funds that would be used to finish the project.

---

[1] Blockchain is a structure that stores transactional records, in several databases, in a network connected through peer-to-peer computers. Smart contracts are programs stored on a blockchain that run when predetermined conditions are met. Smart contracts automate the execution of agreements.

47. The parties estimated that Kaplin's total investment would not exceed $250,000.

48. The parties agreed that Silvers' work on the FP would also be completed by August, 2018.

**Silvers Engages in a Continuous Course of Deceit and Misrepresentations**

49. Once the basic terms were agreed upon, Silvers commenced his work on building the DEX.

50. He identified and retained software developers.

51. Kaplin purchased various computer and other equipment.

52. Kaplin also rented offices in two locations, including Chicago, and eventually, Panama City.

53. Initially, Kaplin retained legal counsel to draft and review contracts with the independent contractors and vendors.

54. Silvers, however, said he could handle all such matters himself, because in his prior employment, he worked closely with attorneys and legal departments.

55. All the expenses were paid by Kaplin personally, and/or by Bendtrand and Runner (collectively, the "Companies").

56. In or about July of 2018, Silvers said he could not complete the project within the agreed upon time, because he had encountered various difficulties and unanticipated hurdles.

57. Among other things, Silvers blamed software developers, who were allegedly "not as good as [he] thought they would be."

58. According to Silvers, he worked "day and night" on building the code and needed just a little more time to complete the project.

59. He promised that things would go faster once he was able to assemble a better team.

60. In or about December of 2018, Kaplin got suspicious about Silvers' ability to perform, as a result of the following events.

61. At the end of the December, 2018, Silvers went to Germany to attend Chaos Communication Congress ("CCC"), an annual conference that featured various lectures and workshops related to cryptography and similar topics.

62. At the CCC, Silvers met Pavol Luptak ("Luptak"), and two other Luptak's associates (collectively "Luptak and Associates"), individuals from Bratislava, who were engaged in various crypto-related projects.

63. Silvers introduced Kaplin to Luptak and his Associates, and on or about January 7, 2019, Kaplin went to Bratislava to meet with them.

64. A few meetings between Silvers, Kaplin, Luptak and his Associates took place between January 7 and 9, 2019 at Paralelná Polis in Bratislava.

65. During these meetings, the participants discussed the DEX.

66. Luptak and his Associates asked Silvers specific and direct questions related to DEX, including, among other things, high frequency trading and safe trading environment.

67. Silvers did not answer many of the questions he was asked.

68. To Kaplin, it appeared Silvers was unable to answer the questions.

69. On or about January 9, 2019, after one of the meetings with Luptak and his Associates, Kaplin and Silvers had dinner at Bratislavska Kozlovna (a restaurant in Bratislava), where Kaplin confronted Silvers, explaining he was concerned about Silvers' inability to answer Luptak's questions.

70. Kaplin explained that he was concerned about progress on the DEX and Silvers' ability to build a functional model of the DEX, as Silvers promised.

71. Silvers assured Kaplin that the only reason Silvers did not answer many of Luptak and his Associates' questions was that he believed they wanted to extract confidential and proprietary information about the DEX.

72. According to Silvers, since the technology he had built was so innovative and unique, Silvers did not want to reveal any details to potential competitors.

73. Silvers assured Kaplin that he had made significant progress on the DEX, that the DEX project was almost completed, and that he had been, and will continue to, "work nonstop" to ensure the project is finished in the very near future.

74. The following day, on or about January 10, 2019, Silvers and Kaplin travelled to Lviv, Ukraine to visit some of Kaplin's friends.

75. As Kaplin continued to have misgivings about Silvers' performance, he again raised the issue about the progress on the DEX.

76. This time, the conversation took place on or about January 10, 2019 when the parties were at Fashion Club, a restaurant in Lviv, Ukraine.

77. Again, Silvers made the same assurances, stating that the DEX project was almost completed, and that the technology was cutting-edge and unique.

78. Silvers swore that he was honest about the progress.

79. He reminded Kaplin that they had been friends for many years, and Silvers would never deceive or be untruthful to Kaplin.

80. Relying on Silvers' representations, Kaplin continued to finance the project.

81. In anticipation that a functional version of the DEX would be built soon, Kaplin continued to maintain offices, pay compensation to the developers hired by Silvers, and pay various other service providers.

82. In addition, capitalizing on his personal relationship, Kaplin spent time and resources trying to recruit blockchain and crypto influencers to conduct public relations work for the project.

83. Furthermore, Kaplin bore the cost of various crypto conferences and summits in Europe, Hong Kong, and Singapore, which Silvers said were necessary to attend.

84. As it later turned out, some of Silvers' "business" travels were for his personal benefit.

85. One such trip was to Hong Kong,[2] where Silvers travelled to meet with a woman, who had previously lived in Chicago, and whom he had been dating.

86. While Silvers continued to reside and work out of the office in Chicago, he travelled to Panama City frequently at Kaplin's expense.

87. After the conversations that took place in Lviv and Bratislava, Kaplin regularly raised concerns about continuous delays, missed deadlines, and having to spend more money than he had planned or anticipated.

88. Silvers always had excuses for the delays.

89. For instance, in or about January, 2020, when Kaplin was in Kiev, Ukraine, he and Silvers spoke on the phone, and Silvers told Kaplin that one of the developers, Andrey Yelabugin, had "sabotaged" the DEX code.

90. Mr. Yelabugin was Silvers' friend and a developer, who Silvers had hired.

91. At the time, Mr. Yelabugin lived in Moscow, Russia, and he worked from there under Silvers for about 9 months.

92. Towards the end of 2019, Silvers fired Mr. Yelabugin.

---

[2] The initial Complaint alleged that the trip was to South Korea (rather than Hong Kong) in error.

93. Silvers said to Kaplin that Mr. Yelabugin had "sabotaged" the DEX code on purpose, and it resulted in significant setbacks.

94. As the delays continued into 2020, Kaplin requested that the project be placed on hold to allow parties to regroup and seek outside investment.

95. Silvers resisted the idea, citing various technical reasons as to why putting the project on hold would not be beneficial or even possible.

96. He continuously assured Kaplin that the DEX was almost completed, and it would be truly unique and innovative.

97. On or about September 1, 2020 when Kaplin was on a trip in Moab, Utah, he had a phone conversation with Silvers, during which Silvers once again said that there was a setback, and again blamed one of the developers.

98. This time, feeling that he has had it, Kaplin told Silvers to immediately freeze the project.

99. But Silvers said the project could not be frozen, because preserving all the work that had been done would cost more than completing the project.

100. According to Silvers, freezing the project would result in a colossal loss and further expenditure of money.

101. During this same phone conversation (that took place when Kaplin was in Moab), Silvers again swore that he was working day and night and needed just a couple more months to complete the DEX.

102. As a result of Kaplin's frequent complaints about continuous delays, Silvers did agree to reduce his shares in Newco to 25%, and eventually to 12.5%.

103. By the end of 2020, Kaplin expressed to Silvers that unless a functional version of the DEX was completed within the next few months, he would stop financing, regardless of consequences.

104. Silvers assured Kaplin that the project would be completed by no later than April 15, 2021, and that it was a firm deadline.

105. On or about March 1, 2021, Kaplin engaged legal counsel to form Newco in the U.S. and to conduct a legal review ensuring that the first version of the DEX would be in compliance with the applicable U.S. laws.

106. Silvers once again resisted legal counsel's involvement.

107. He told Kaplin, as he had done before, that he had an extensive knowledge and familiarity with all the potentially applicable legal issues, because as part of his prior employment, he "worked closely with legal and compliance."

108. He told Kaplin that the attorney's involvement was unnecessary and a waste of his time.

109. In communication with legal counsel, Silvers was evasive and reluctant to provide basic information about the code.

110. When he was asked to prepare a spreadsheet describing the technology and was given specific directions as to what data the spreadsheet must contain, Silvers provided irrelevant and incomplete information.

111. Gradually, it became apparent that Silvers had failed to do what he had promised.

112. First, it became apparent that – contrary to Silvers' numerous representations that he was coding "day and night" – Silvers did not do much coding.

113. Software developers, who worked for the Companies under Silvers, reported that, all in all, Silvers built less than half percent of the code.

114. Silvers' participation consisted of instructing the developers as to what features they were expected to build.

115. His instructions were erratic, inconsistent, and often caused the developers to raise their eyebrows.

116. Further, it became apparent that Silvers' continuous representations that a functional DEX was almost completed turned out to be a blatant lie.

117. In actuality, from the beginning of 2018 until March of 2021, the developers were mostly working on building a blockchain.

118. Based on the developers' reports, in the beginning of 2021 the blockchain was still incomplete and was "not connecting properly."

119. Based on the developers' reports, they "did not even touch smart contracts" – the very foundation of any DEX – until the beginning of 2021.

120. One developer did work on a front-end feature of the DEX, primarily consisting of a crypto wallet, but the wallet was never completed.[3]

121. Based on the developers' reports, Silvers dedicated substantial resources to building various other software, that was completely unrelated to the DEX.

122. For instance, Silvers was a ping pong enthusiast and played ping pong on a weekly basis.

123. Without Kaplin's approval and authorization, Silvers dedicated substantial resources to building a software application related to ping pong, and other types of software, completely unrelated to the DEX (the "Unauthorized Software").

124. Still, even the Unauthorized Software was never completed.

---

[3] Crypto wallet is a software program that stores the passwords that allow access to cryptocurrencies.

125. The code that was built (for both the Unauthorized Software and DEX) was never properly documented.

126. Moreover, pursuant to Silvers' instructions, the developers incorporated hundreds of open-source software into the code without any review or understanding of the applicable licensing restrictions.

127. Generally, use of open-source software in violation of the applicable licensing restrictions may result in substantial liability.

128. With respect to the FP, even though Silvers received full compensation for the FP back in 2017, he never completed the work.

129. Instead, unbeknownst to Kaplin, Silvers directed one of the Companies' developers to work on the FP.

130. Pursuant to Silvers' direction, the developer equipped the FP with unnecessary features which were never requested or authorized by the Traders.

131. Kaplin had to pay additional sums to the developer to finish the FP, and to remove the unnecessary features.

### Silvers Engages in Further Illegal Conduct

132. In or about March of 2021, as it was becoming apparent that Silvers had failed to perform as promised, Silvers' behavior became erratic.

133. Among other things, Silver denied that he agreed to 12.5% in Newco, stating that it was Kaplin who should get 12.5% because the code was Silvers' "baby."

134. He proclaimed that he could have been making $400,000 per year, but instead was working for "nothing" and demanded that Kaplin pay him salary and benefits.

135. At one time, he told Kaplin that it did not matter that the DEX was never built, because the Unauthorized Software that was built was better than the DEX.

136. When Kaplin noted that he spent about $1.4 million paying for something he did not agree to, Silvers stated that this also did not matter, because $1.4 million was "nothing" to Kaplin who could "make a million in a day."

137. When Kaplin scheduled a meeting with potential purchasers of the technology in an attempt to recover some of his losses, Silvers failed to show up, falsely claiming that he was ill and had to go to a hospital.

138. On or about May 1, 2021, after yet another conflicted conversation with Kaplin, Silvers stated that Kaplin was "no longer needed," and that he had only been "hurting the project" with his insistence on deadline and deliverables.

139. Silvers declared that because Kaplin did not know "anything about technology," Silvers would not give him the code.

140. As proof that Kaplin knew nothing about technology, Silvers stated that he always had access to Kaplin's personal computer, without Kaplin's knowledge.

141. A few minutes later, Silvers unilaterally and without notice, cut off Kaplin and software developers' access to their email accounts.

142. In addition, Silvers cut off the software developers' access to Jira knowledge management software and a database containing the code.

143. Furthermore, Silvers cut off Kaplin's access to other Companies' business records and accounts.

144. In addition, on the same day, acting through an agent in Panama City, Silvers confiscated a computer from one of the software developers in Panama City.

145. On or about May 1, 2021, Kaplin, via an email and certified letter, demanded that Silvers restore Kaplin's access to the code, emails and other accounts.

146. Kaplin also demanded that Silvers return all of the Companies' property and assets that were in Silvers' possession, including all documentation related to the source code; all backup documentation and technical specs; email communications and video recordings; passwords and admin rights to hosting, domain names, Jira knowledge management software, and other cloud-based and physical systems.

147. Kaplin also demanded that Silvers return and surrender all physical property and equipment that was in his possession or under his control, including all computers, flash drives, hard drives, and phones.

148. Silvers refused to comply.

149. Kaplin made the same demand again on May 17, 2021.

150. Again, Silvers refused to comply.

## COUNT I
## BREACH OF ORAL CONTRACT

151. Plaintiffs incorporate by reference the allegations contained in paragraphs 1-6, 25-43, 45-47, and 111, as if fully set forth herein.

152. The oral agreement between Kaplin and Silvers to build the DEX (the "Agreement") was a valid and enforceable contract.

153. Kaplin fully performed his obligations under the Agreement.

154. Silvers breached the Agreement when he failed to build the code for the DEX.

155. As a result of Silvers' breach, Kaplin and the Companies suffered damages.

WHEREFORE, the Plaintiffs, Alexander Kaplin, Bendtrand Global Services S.A., and Runner Runner LLC pray that this Court enter a judgment in their favor and against the Defendant, Daniel Silvers, in the amount to be determined at trial, together with interest and costs of this action, and any other relief that the Court deems just and proper.

## COUNT II
## FRAUD

156. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

157. Silvers made numerous false statements of material fact.

158. Silvers knew that his statements were false.

159. On multiple occasions, Silvers stated to Kaplin that he was coding "day and night" knowing that his statements were false.

160. On multiple occasions, Silvers stated to Kaplin that the DEX was almost completed knowing that his statements were false.

161. On multiple occasions, Silvers stated to Kaplin that Silvers was building a DEX technology that was unique and innovative, knowing that his statements were false.

162. When Kaplin wanted to freeze the project, Silvers stated that it could not be done, and that an attempt to do it would result in a huge losses and further expenditure of money, knowing that his statements were false.

163. Silvers intended to and, in fact, did induce Kaplin to reasonably rely and act on the false statements.

164. Silvers' pattern of deception constitutes a scheme to defraud.

165. Silvers' fraudulent conduct resulted in damages to Kaplin and the Companies.

WHEREFORE, the Plaintiffs, Alexander Kaplin, Bendtrand Global Services S.A., and Runner Runner LLC pray that this Court enter a judgment in their favor and against the Defendant, Daniel Silvers, in the amount to be determined at trial, together with interest and costs of this action, and any other relief that the Court deems just and proper.

## COUNT III
## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030(a)(5)(C) ("CFAA")

166. Plaintiffs incorporates by reference the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

167. Silvers violated CFAA when he gained access to Kaplin's personal computer, without Kaplin's knowledge or permission.

168. Silvers further violated CFAA when he unilaterally and without notice, cut off Kaplin and software developers' access to their email accounts.

169. Silvers further violated CFAA, when he blocked the software developers' access to Jira knowledge management software and a database containing the code.

170. Silvers' conduct caused impairment to the integrity or availability of data and information.

171. Silvers' conduct caused a loss in excess of $5,000.

172. The loss consisted of the expenses Kaplin and the Companies incurred in responding to the offense, conducting a damage assessment, and restoring the systems to their condition prior to the offense.

WHEREFORE, the Plaintiffs, Alexander Kaplin, Bendtrand Global Services S.A., and Runner Runner LLC pray that this Court enter a judgment in their favor and against the

Defendant, Daniel Silvers, in the amount to be determined at trial, together with interest and costs of this action, and any other relief that the Court deems just and proper.

## COUNT IV
## CONVERSION

173. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

174. Kaplin and the Companies had a right to the property, which included the code and all documentation related to the code; all backup documentation and technical specs; email communications and video recordings; computers, flash drives, hard drives, and phones.

175. Kaplin and the Companies had an absolute and unconditional right to the immediate possession of this property.

176. Kaplin made numerous demands for possession of the property.

177. Silvers wrongfully and without authorization assumed control, dominion, or ownership of the property.

WHEREFORE, the Plaintiffs, Alexander Kaplin, Bendtrand Global Services S.A., and Runner Runner LLC pray that this Court enter a judgment in their favor and against the Defendant, Daniel Silvers, in the amount to be determined at trial, together with interest and costs of this action, and any other relief that the Court deems just and proper.

## COUNT V
## UNJUST ENRICHMENT

178. Plaintiffs incorporate by reference the allegations contained in paragraphs 1-6, 11-24, 44 and 48, as if fully set forth herein.

179. Silvers received compensation for the FP, but did not complete his work on the FP.

180. Silvers also received an interest-free loan from Kaplin in the total amount of $340,000.

181. Silvers' retention of the benefits he has received violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, the Plaintiffs, Alexander Kaplin, Bendtrand Global Services S.A., and Runner Runner LLC pray that this Court enter a judgment in their favor and against the Defendant, Daniel Silvers, in the amount to be determined at trial, together with interest and costs of this action, and any other relief that the Court deems just and proper.

Date:   March 22, 2023                                  Alexander Kaplin, Bendtrand
                                                        Global Services S.A., Runner
                                                        Runner LLC

                                                        By: /s/  Gene Hook
                                                        Counsel for the Plaintiffs