IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BENDTRAND GLOBAL SERVICES S.A., RUNNER LLC and ALEXANDER KAPLIN<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>DANIEL SILVERS,<br><br>　　　Defendant. | Case No: 21-CV-4684 |

**AMENDED AFFIRMATIVE DEFENSES**

Defendant Daniel Silvers, for his Affirmative Defenses Complaint filed by Bendtrand Global Services, S.A., Road Runner, LLC, and Alexander Kaplin ("Plaintiffs"), states as follows:

**I. Facts Common to All Affirmative Defenses**

1.　　Silvers agreed with Kaplin in March 2018 to start Research and Development (R&D) for a Decentralized Crypto Token Exchange.

2.　　After a few months, Kaplin decided that the Chicago office developers would create the back-end code of the system. Back-end code development is the process of creating the behind-the-scenes technology that makes websites and applications work smoothly, handling tasks like blockchain, data storage, and processing, and Kaplin as a CEO of the project will comply with USA regulations with the help of his sister Svetlana Kaplina who is a corporate lawyer.

3.　　Specifically, Silvers and the developers would use as a foundation delegated proof-of-stake open-source blockchain code Semux (semux.org), which was released under the permissive MIT License. The MIT License allows the use and modification of the code in your own projects for commercial purposes.

4.　　The blockchain was designed to utilize a decentralized open-sourced file system

1

called IPFS (InterPlanetary File System), which is also released under an MIT License. Additionally, the blockchain was optimized and integrated with GraalVM Community Edition, the open-source version of GraalVM Oracle. GraalVM provides a high-performance runtime for running applications and executing languages such as Java, JavaScript, Python, Scala, Kotlin, Groovy, Clojure, R, C, C++, and Rust. It is released under the GNU General Public License version 2 (GPLv2) with the Classpath Exception.

5. Kaplin explained he is a resident of Panama. Kaplin opened an office in Panama City, Panama for his Panamanian company Bertrand Global Services where Kaplin is owner and has a local Panamanian legal support office to create a crypto wallet registered with Google, Apple, and Windows under the commercial name ICTE (Interplanetary Crypto Token Exchange) using local Panamanian software developers.

6. Kaplin promised to raise funds using Initial Coin Offering (ICO) from Panama, and not the US, using third-party ICO providers in order for the project developers to continue developing the code. Kaplin promised that the crypto-wallet code developed in Panama would be available for download on the Google Store, Apple Store, and Windows Store under Bertrand Global Services as an open-source and be community owned in many different countries and languages to promote the expansion of the digital exchange based on blockchain with Panamanian office in charge.

7. Following US regulatory requirements, Kaplin and companies said he would welcome anyone who had registered a domain to participate in blockchain federation, become a member of blockchain, have an open-sourced digital wallet from Bertrand Global Services, own a blockchain server, transact on a blockchain network and customize it to the business needs of a particular company or organization. Kaplin said he would promote that the more registered

websites someone owns connected to Bertrand Global Services the more digital assets someone will be accumulating from digital wallet users.

8.  Kaplin decided Panama would deploy an open-source digital wallet to transact with blockchain and target implementation using other providers like Telegram. Kaplin agreed to give the ability to anyone who downloaded a crypto wallet from a mobile app store be able to connect and provide crypto funds for the expansion of the project in return for a utility stable token named IEO.

9.  Kaplin agreed to work with Know Your Client ("KYC") and Anti-Money Laundering ("AML") providers globally after he raised funds through a Panamanian-built crypto digital wallet to comply with regulators. Kaplin promoted that the payment structure would be so that the developers will be converted to earn salary strictly from blockchain ownership.

10. Kaplin agreed to build a legal technical company in the USA from the start that will own the back-end code, but when he was asked almost a year later why Runner-Runner suddenly started sending semi-monthly payments to back-end developers in Chicago if that Runner Runner a technology company Kaplin answered no.

11. Kaplin stated that he cannot use Runner Runner because Kaplin was using Runner Runner for trading USA equities. This is where Silvers first became concerned that KYC and AML compliance was not being followed.

12. Kaplin, as an expert and a trader of Exchange-Traded Funds (ETF), changed his mind. Kaplin decided the goal of the creation of a decentralized exchange software code project was to replicate the Exchange-Traded Fund (ETF) structure utilizing block-chain and connect block-chain with the Depository Trust & Clearing Corporation (DTTC) to provide secure ETF composition globally and connect with global providers like Refinitiv.

13. Silvers agreed to import Kaplin's new plan into the Code into which was converting, delivering, and displaying worldwide ETF model data from DTTC using a highly compressive digital format that Silvers was developing for many years with stipulations that it will be used by the blockchain and in the project only if the project will be successful, otherwise, Silvers would need to fail back and continue charge maintenance fees for its use, as Kaplin greatly benefits from it.

14. Kaplin promised Silvers that he will not give back-end implementation, compression, security, paradigms, and mechanisms to any other developers (including Panamanian developers) hired by Kaplin, or open-sourced the code. Kaplin agreed to install TeamViewer on his controlled computers and required all participants in the project to use the TeamViewer program which is software that lets you remotely control and access another computer from anywhere in the world, it uses encryption and security measures to ensure a secure connection between computers, protecting owner data and maintaining privacy during remote access sessions. With TeamViewer, the computer owner, has full control over access permissions, allowing them to determine who can remotely access their computer and when ensuring secure and controlled remote connections.

15. Kaplin agreed that he would grant Silvers remote access to his computer during nontrading hours and only when it will be necessary to test and demo the project code and when the Bloomberg market data terminal is required.

16. Kaplin agreed that developers and designers on the project would receive to keep a minicomputer with blockchain perpetual license installed and connected to a blockchain test and utilize networks through the orchestration of a Docker Compose container and CloudFlare securely in order to provide a seamless jump start in developing and maintaining future blockchain

4

membership.

17. Kaplin agreed that the Chicago office would be the blockchain development, testing, and demo facility, and the rest of the production will be Kaplin's sole responsibility in Panama City, Panama office under Bertrand Global Services with commercial name ICTE including branding, marketing, sale and all the compliance required by all regulations.

18. In addition to claiming expertise in trading cryptocurrencies, Kaplin recognized the significance of hiring crypto marketing experts to provide additional guidance in navigating the rapidly evolving blockchain market. With a profound understanding of the dynamic nature of the crypto landscape at the time, Kaplin proactively sought to assemble a team of highly knowledgeable professionals who could offer personalized advice and insights to assist him in the realm of cryptocurrencies. Notably, this team included individuals such as Melinda Woolf, Patrice Berthome, Amber Brandner, George Chikovani, and Evgeni Mitkov.

19. Kaplin and Silvers agreed that Silvers would grant the project access to use Silvers' HTU.IO domain with Google Workspace and associated Google Workspace services for the duration of the project. Prior to accessing HTU.IO Google Workspace services, it was mandatory for Kaplin and others to agree to the terms of usage and the duty of the workspace administrator. As the super administrator of the HTU.IO domain, Silvers would oversee the management and administration of the domain and Google Workspace account. Kaplin instructed Silvers to remove individuals who were terminated from the project from the email system and restrict their access to updates for a "Golden backup copy" of the development source code. Once removed from HTU.IO the system was designed to automatically remove the individual from accessing the project-associated services including JIRA.

20. The ICTE crypto wallet developed by Bertrand Global Services in Panama City,

Panama was operational and available for download on major application stores (Google, Apple, Windows) in various languages starting from September 2020.

21. The wallet was connected to the fully redundant ICTE cross-blockchain network system distributed in fifteen countries, which had been in production since June 9, 2020. The wallet facilitated the exchange of the IEO Bertrand native token with other cryptocurrencies such as BTC, ETH, MONERO, TRON, and others.

22. Despite the above, Kaplin did not fulfill the necessary requirements to comply with U.S. regulations for the decentralized exchange. Furthermore, Kaplin made promises to raise funds and engage other participants to support the project but failed to deliver on these commitments. Specifically, he did not bring on board the anticipated crypto influencers who were expected to contribute to the project's growth as promised.

23. Based on the information provided, Silvers denies that Kaplin followed through on the necessary actions and commitments to establish a functional decentralized exchange as alleged in the mentioned paragraphs of the Complaint.

24. On April 12, 2021, Kaplin unilaterally made the decision to terminate all the developers on the project by the end of April 2021.

25. At Kaplin's instruction, on April 30, 2021, Silvers removed the email accounts of the developers who were no longer involved in the project.

26. This action was taken to restrict their access to updates of the "Golden backup copy" of the development source code as per Kaplin's instruction. Silvers did not unilaterally or without notice cut off Kaplin's access to his email account or that of any software developers. Silvers' actions followed Kaplin's instructions regarding users' termination and the associated email account access restrictions. Kaplin never lost, and still has, access to all his emails related to the

6

project.

## II. AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole or in part by the doctrine of estoppel.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole or in part by the doctrine of unjust enrichment, as Plaintiffs' retention of the software developed by Defendant would be unjust if Plaintiffs' also recovered damages for breach of contract.

### THIRD AFFIRMATIVE DEFENSE

Count I is barred by the Statute of Frauds

### FOUTH AFFIRMATIVE DEFENSE

The claims in Plaintiffs' Complaint are barred, in whole or in part, to the extent any injury sustained by Plaintiffs was caused by their own conduct.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiffs who have sold, destroyed, damaged, altered or otherwise disposed of the technology developed by Defendant are barred, in whole or in part, from recovery.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the doctrines of unclean hands, and *in pari delicto.*

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred due to its failure to mitigate damages, if any.

WHEREFORE, Defendant/Counter-Plaintiff, Daniel Silvers respectfully requests that this Court enter an order dismissing with Plaintiffs' Complaint.

Dated October 27, 2022          Respectfully submitted,

                                               **DANIEL SILVERS,**
                                               Defendant/Counter-Plaintiff

                                               By:    /s/*Alexander N. Loftus*
                                                                   One of His Attorneys

Alexander Loftus, Esq.
Ross Good, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark St., Suite 1600
Chicago, Illinois 60601
T: 312.899.6625
C: 312.772.5396
alex@loftusandeisenberg.com
ross@loftusandeisenberg.com

8